PEOPLE, PLAINTIFF AND APPELLEE, *v.* RODRÍGUEZ ET AL., DEFENDANTS AND APPELLANTS.

APPEAL from the Second District Court of San Juan in a Prosecution for Libel.

No. 1880.—Decided April 9, 1923.

LIBEL—PUBLIC INTEREST—REPRESENTATIVE CAPACITY—PRIVILEGED COMMUNICA- TION.—The defendants in this case were charged with the crime of libel con- sisting in having maliciously defamed the Municipal Judge of Bayamón by addressing the following telegram to Dr. Barbosa of San Juan: "Munici- pal Judge closed registration booth and refused to allow registration re- publican voters. Shortly afterwards opened it again to register unionist voters. Manifest partiality. Urge investigation facts. Indignant public protest." On the result of the evidence, *held:* That the defendants exceeded the proper limits in their charges, but having based their action on an act apparently unlawful, although not criminal, of the municipal judge, who is the chairman of the board of elections, the matter being one of public inter- est and the defendants having acted in a representative capacity, communi- cating exclusively with a person who held a similar position on a higher

plane and with the public official in charge of the supervision of the elections throughout the Island, their communication should be considered as conditionally privileged.

The facts are stated in the opinion.

*Messrs. A. P. Rodríguez* and *L. Feliú* for the appellants.

*Mr. José E. Figueras, Fiscal,* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This was a prosecution for libel. The information, in so far as pertinent, reads as follows:

"The said defendants, Artemio P. Rodríguez, A. Acevedo and Genaro Cotto, as principals, in Bayamón, within this municipal judicial district, on or about the 28th of May, 1920, unlawfully, wilfully and maliciously published and caused to be published a telegram addressed to Dr. Barbosa of San Juan and containing the following malicious libel: 'Municipal Judge closed registration booth and refused to allow registration republican voters. Shortly afterwards opened it again to register unionist voters. Manifest partiality. Urge investigation facts. Indignant public protest.' This telegram, containing the malicious defamations transcribed, was circulated on the date and at the places above stated, and the said imputations referred to Ernesto Díaz Arana, Municipal Judge of Bayamón, and tended to impeach his honesty, virtue, integrity and good reputation, thus exposing him to public hatred, contempt and ridicule."

Demurrers of the defendants were overruled and after a trial the court found them guilty and sentenced them each to pay a fine of $25, or in default of payment to one day in jail for each dollar not paid. From this judgment they took the present appeal to this court, assigning eighteen errors.

We shall not discuss all of the errors assigned. We shall assume that the information charged the commission of a public offense and that the defendants had no right to a jury trial, in accordance with the jurisprudence established by this court in *Ex Parte Bird,* 5 P. R .R. 241, 253, limiting the consideration of the case to the evidence and the law

and jurisprudence applicable in accordance with the said evidence.

At the trial the district attorney introduced the evidence for the prosecution consisting of the telegram transcribed in the information and a copy of the newspaper called *El Tiempo* in which it was published. A motion for nonsuit having been overruled, the defendants introduced their evidence and finally the district attorney offered the testimony of three witnesses.

The defendants first offered a copy of another telegram similar to the one transcribed in the information and addressed to the Superintendent of Elections. The investigation requested was made and the report made to the Attorney General by *fiscal* at large Rivera Zayas of the said investigation was introduced in evidence. The said report contains a detailed statement of the proceedings followed and of the evidence examined and concludes as follows:

"My conclusion is that the charge made against the Municipal Judge of Bayamón as chairman of the Local Board of Elections of having hindered the registration of Republican voters has not been proved. There is no doubt that a barrier was put up before six o'clock, but it has not been shown that this was done for the purpose of not registering any more voters, for, on the contrary, when the barrier was put up there were in the booth ten voters who were being registered.—I recommend that the practice of putting up this barrier be prohibited, but in any event the door of the registration booth should always be open in order to avoid incidents like the one under consideration. However, this is a matter within the jurisdiction of the Superintendent of Elections who has charge of the inspection and regulation of the work of the local registration boards, and, therefore, I also suggest that a copy of this report and of the record of the investigation be sent to the General Superintendent of Elections so that he may have an opportunity to examine the evidence and determine what may be best, in his opinion, for the public interest."

Then Artemio P. Rodríguez, one of the defendants,

Francisco Baldorioty and Andrés Avelino Escalera were called as witnesses.

Their testimony is very long and difficult to summarize. We shall transcribe therefrom the parts which seem to be appropriate to give an idea of the testimony of each.

The first witness testified as follows:

" *   *   * ; that when the telegram (exhibit A for the prosecution) signed by him and by A. Acevedo and Genaro Cotto was sent to Dr. Barbosa the witness was chairman of the Local Republican Committee of Cataño; that as such it was his duty to attend to everything connected with the registration of republican voters in Cataño and supervise generally all matters of the party in the locality; *   *   * that the other two defendants were registration inspectors for the local committee; *   *   * that on May 28 he was there; that it was about 5 o'clock or a little later when he went to the registration booth accompanied by some republican voters who went inside to be registered; that he remained outside and a few moments thereafter the local board declared the registrations closed and put up a barrier at the entrance door, as was done on all registration days when the registration was finished; that on seeing this he asked the policeman at the door if the booth had been closed and he answered in the affirmative; that thereafter some republican voters came to be registered and he knew that they were republicans because they came with republican runners designated for that purpose *   *   * ; that these voters found that the registration was closed and they could not register, for they were not admitted into the booth; that thereupon he entered the registration booth as usual to take note of the number of persons who had been registered; that he approached the table of the justice of the peace to make this note, as he was the one who kept the record; that while he was making the note he heard a disturbance outside and heard voices saying 'that man is from Pueblo Viejo;' that on hearing this he looked out and saw Dr. Figueroa coming with some voters to be registered; that he was told that the booth was closed; that then Dr. Figueroa took out his watch and holding it in his hand said that it was not closing time and that the booth could not be closed; that the witness then called the attention of Díaz Arana to the fact that he had closed the booth to the republicans and should not open it for those brought by Dr. Figueroa;

that thereupon Dr. Figueroa asked permission to enter and went around and entered by the door by which the registered voters left the place; that they were discussing the matter inside and when the witness called the attention of Díaz Arana to the fact that the republican voters had not been registered, he replied: 'That is true, but you made no protest, whereas 'these people protest and claim their rights and as it is not six o'clock I am compelled to open' * * * ; that thereupon the witness left the place, went to the committee's office, made some inquiries and then they left for the telegraph office to send the telegram; that the telegram was sent to Dr. Barbosa; that when this telegram was sent Dr. Barbosa was the adviser of the Republican Party and resided in San Juan; * * * and besides Dr. Barbosa is the most prominent leader of the party to whom all turn in cases of emergency, * * *."

Witness Baldorioty said:

"That on May 28th he was at the registration booth in Cataño as challenger for the Republican Party; that when the registration was terminated he was in the booth; that it was about 5.25 p. m. on that day when the chairman of the board ordered that the booth be closed because there were sufficient voters inside for the day's registration; that he immediately protested and said that it was 5.25, that the booth should be closed at 6, and that there were republican voters waiting to be registered; that the barrier was put up as usual and there remainded only those voters that were inside to be registered; that Artemio P. Rodríguez came to the booth on that afternoon, as he usually did when the office was clased, to take a note of the voters registered each day; * * * that after the registration had been finished that afternoon Dr. Figueroa came with a voter to be registered and was told that the booth was closed; that Dr. Figueroa wanted to enter by the door where the barrier was placed to indicate that the registration was finished, and he asked the chairman's permission to enter and was told to come in through the exit door; that he did so and the voter was registered thereafter; that one unionist and one republican were registered; that this barrier was put up every day when the registrations were finished and indicated that the booth was closed and that no more people would be registered, and that after the barrier was put up he saw at the door some voters who

came to be registered, one of them named Alma; that they were republicans; that these voters did not register; that there were two or three, a certain Camacho and one Palenque, who registered · that they came after the barrier was put up and did not register; that the voter brought by Dr. Figueroa was registered because there had been a discussion and Dr. Figueroa contended that it was not six o'clock;   *   *   * ''

Witness Escalera corroborated the testimony of Rodrí guez and Baldorioty.

The evidence in rebuttal consisted of, as we have said, the testimony of Judge Arana, clerk Bas and Dr. Figueroa.

The first testified as follows:

"That on that day the Cataño registration booth was closed at six o'clock sharp; *   *   * that at twenty minutes to six several groups of voters came; that by reason of the fact that no file was formed the policeman paid little attention to the entrance door because he had to go around the whole place to watch the exist door and the surroundings in compliance with the one hundred meters statute, and the voters entered at their pleasure; that as the witness was preoccupied with the voters and tired of waiting for them, he did not notice what was happening until he saw that at the two tables used by the board for the registration there was a great number of voters, about sixteen or twenty; that the thought struck him at that moment that if more voters were admitted the registration would be hindered and it was always his purpose that the registration should be made as orderly as possible; that therefore he ordered Bas *   *   * to take the barrier and lean it against the door so as to prevent the entrance of more voters, thus permitting the registration of those that were formed in line; that Bas leaned the barrier against the door, but left a small opening that was never closed; that the barrier was never used to close the booth except that day because of what he had just explained; that about that time Dr. Figueroa came in by the entrance door with some voters and he thinks also that Rodríguez came in with one or two republican voters; that they could not enter because the place was full, but as soon as some of the people by the tables left they entered and had their voters registered; that at no time was the registration stopped; that absolutely nobody was refused registra-

tion on that day or on any other day in any of the precincts of Bayamón; that all who came were registered; that about the time of the occurrence which he has described Rodríguez came in by the exit door and asked whether the registration booth was closed, and the witness invited him to come in and told him that the booth was not closed because it was not six o'clock; that at the same time he took out his watch and looked at the clock in the park with which it agreed and Rodríguez also took out his watch, which he always carried on registration days, because he was a political leader and needed it, and he ascertained that I was telling the truth; that thereupon Rodríguez said that his voters had gone away and the witness smilingly replied that he had seen no voters around; that those at the door had come inside and those inside were registering; that Rodríguez said that he would protest and the witness replied that he might do as he pleased; that Rodríguez went away and the incident was closed; that no republican voter was refused registration.''

The second testified as follows:

''That his name is José Bas Aguilar; that he is the clerk of the Municipal Court of Bayamón; that he was such on May 28, 1920; that he was in Cataño on that day for the registration of voters; that on that day the registration booth was closed at the usual hour of six o'clock; that Judge Díaz Arana did not order the closing of the booth before six; that all of the voters who came before the board were registered; that Judge Díaz Arana did not refuse to register any republican voter; that he saw Artemio P. Rodríguez there; that at about half past five or a quarter to six, or twenty minutes to six, when closing time was near, there was a slight disturbance; that there were some voters in the booth and in order that no more should come in until these were registered, I was ordered to put up the barrier at the entrance door until those that were inside were registered, when others would be admitted; that after the barrier was put up they brought a voter of Pueblo Viejo and there was some disturbance because the people said that he did not belong to the locality, notwithstanding which he was registered; that he believes that after the barrier had been leaned against the door two or three other unionist and republican voters came in and they were all registered; that after the barrier had been put up no republican voter came in who was refused regis-

tration by Judge Díaz Arana. * * * That the slight disturbance to which he has referred was because somebody brought a republican voter who did not belong there; that the unionists brought him from Pueblo Viejo; that he knows that he was not a voter there because the unionists said that he should not enter because he was from Pueblo Viejo and did not belong there; that at that moment he was by the barrier and asked the unionists to let him register and then challenge him, if he was not a resident; that thereupon Artemio P. Rodríguez, who was bringing that voter to register, at about half past five in the afternoon, after the barrier had been put up intervened; that Artemio P. Rodríguez did not enter the booth at the same time that the voter did, but entered afterwards; that he was very angry and said that it was an outrage and that he would complain that republican voters were refused registration; that he was saying this while coming in by the front door, the door on the road; that the voters entered by another door, the door on the alley; * * * ''

Dr. Figueroa testified:

"That he witnessed the actions of the chairman of the board, Díaz Arana, from five to six o'clock; that during that time all voters that came to register were registered; that no voter was refused registration; that he took voters to register on several occasions; that from five to six in the afternoon he took voters to register and after half past five there were several voters in the booth who were registering, and after these voters which he took at that hour were registered, some republican voters whose names he does not remember were also registered.—On cross-examition he said: That between half past five and six in the afternoon, to be exact, at twenty minutes to six, he took some voters to register; that these voters he brought from his home where he was keeping them so as to be able to register a greater number than the adversary on that day; that his home was about half a block from the registration booth; that he in person took them; that he went to his home to fetch them; that he entered the booth by one door and the voters by another; that he entered by the door on the road and the voters entered by the door where they used to form in line. * * * That he did not enter by the entrance door because when he came with his voters there was near the entrance

door a barrier which although it did not entirely close the entrance, was leaning against the door; that when he put them in line the representative of your party told him that the booth was closed; that thereupon the witness took out his watch and said: 'The booth can not be closed because it is twenty minutes to six' and from the door a barrier which although it did not entirely close the entrance, the time by the clock of the booth to see if his time was correct, because he was of the opinion that it was a quarter to six, or rather, twenty minutes to six, and the booth could not be closed because the law provided that it should be closed at six; thereupon the chairman of the board authorized him to enter and he went around the house and entered by the front door, the south door of the house; that he then looked at the clock and said to the judge: 'I have been .told that the booth is closed; on registration days I am in the habit of setting my watch at seven in the morning by the registration booth clock; my watch marks twenty minutes to six and the clock here marks twenty minutes to six' and I said that the registration booth was not closed; that there was a number of people inside; that thereupon his voters remained in the line outside and in due time came in, as did another voter taken there by an uncle of Rodríguez, who was registered.  *   *   * ''

On introducing their evidence the defendants said: ''This evidence is offered to support our defenses of justification and privilege. Our defense rests on the propositions that this is a case in which the charges are true, and that this is a privileged communication.''

As regards the first proposition, section 246 of the Penal Code provides that in all criminal prosecutions for libel, the truth may be given in evidence to the court or jury, and if it appears to the court or jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. It is, therefore, necessary to prove not only that the charge is true, but also that it was published with good motives and for justifiable ends.

On the second point we must be guided by the doctrine

laid down in numerous decisions of the courts. Ruling Case Law condenses it as follows:

"A publication is conditionally or qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, or where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do. This general idea has been otherwise expressed as follows: A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. In the absence of malice an utterance may be qualifiedly privileged, even though it is not true, and notwithstanding the fact that it contains a charge of crime. But mere color of lawful occasion and pretense of justifiable end cannot shield from liability a person who publishes and circulates defamatory matter. Hence, a publication loses its character as privileged, and is actionable, on proof of actual malice, or, at least, such gross disregard of the rights of the person injured as is equivalent to malice in fact. In the case of a qualifiedly privileged communication the occasion on which it was made rebuts the inference *prima facie* arising from a statement prejudicial to the character of the plaintiff, and puts the burden on him to prove that there was malice in fact, that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made.

"Although the general rule is that a communication made in good faith on any subject matter in which the person communicating has a duty is privileged if made to a person having a corresponding interest and this duty need not be a legal one but may be only a moral or social duty of imperfect obligation, it has been very clearly stated that no privilege results merely from the fact that a defendant believes that he owes a social duty to give currency to rumors of a libelous character so that the victim of them may be avoided. Such broad and indefinite duties the doctrine of qualified privilege has not yet been extended to cover. A publication issued

solely to further the financial ends of the publisher enjoys no privilege. For example, a letter voluntarily written by one of two rival dealers acting from motives of personal gain to be secured through the injury of his rival, warning a shipper against sending goods to such rival, is not a privileged communication, and a mere belief in the truth of the statements contained therein, without good cause for such belief, is no defense to an action for libel. Moreover, although the doctrine of qualified privilege as applied to certain classes of communications is very generally recognized, communications containing defamatory statements should not as a rule go beyond what the occasion requires, and no protection will arise against the prosecution of an action for libel or slander, although there may exist a common interest or duty of the parties between whom a communication passes, if the statements made are not relevant to or go beyond the subject matter or purpose in question. On the other hand it has been held that exceeding the privilege of a communication about a matter in which both parties have an interest does not destroy the privilege, but the excess of statement is material only as bearing on the question of malice; nor, it has been ruled, can the court take from the jury the consideration of the excessive character of a publication. It seems that the mere fact that the language in a defamatory writing on a privileged occasion is somewhat strong or intemperate is not, in the absence of evidence of lack of good faith, such evidence of malice as will show an abuse of the privilege.

''As the privilege of an occasion should not be exceeded by the addition of extrinsic or irrevelant matter to a defamatory publication, so as a general proposition the publication of a defamatory statement qualifiedly privileged should go no further than is required by the moral or social duty to publish, and if a publication is designedly or unnecessarily or negligently excessive, the privilege is thereby lost, or at least whenever a defendant deliberately adopts a method of communication which gives unnecessary publicity to statements defamatory of the plaintiff, the jury will be apt to infer malice. One making a privileged communication must, therefore, be careful that his words reach only those who are concerned to hear them, and words of admonition or confidential advice should be given privately, not written on post cards or published in the newspapers. It has been held, however, where a communication otherwise privileged has been sent by post card instead of by a closed letter that if the communication cannot be understood by

the persons through whose hands it passes as referring to the plaintiff, there is no evidence of express malice to avoid the privilege. As respects the overhearing, by strangers, of communications qualifiedly privileged, the rule appears to be that, while the mere fact that casual bystanders, not legally interested in the communication complained of, are present and hear it, does not, necessarily, remove the privilege, an unwarranted communication to strangers, whether the result of carelessness or intentional misconduct, may be evidence of malice and render the. communication actionable. The privilege of a communication by the treasurer of a corporation to its manager, directing the discharge of the foreman and giving the reason therefor, has been held not to be lost by showing it to the night watchman, on the ground that the latter was interested.'' 17 R. C. L. 341-344.

Let us now analyze the evidence. There is no doubt that it shows that a barrier was put up at the door of the registration booth by order of the judge before the hour fixed by law for closing it and that the said act was interpreted as the closing of the booth. It is doubtful whether for that reason any republican voters failed to register. It is true that after the barrier had been put up it was opened to permit the entrance of two unionist voters brought by Dr. Figueroa, who claimed their rights. It is true that there in the presence of the judge one of the defendants said that the booth had been closed and that it was so understood by the people. It is also a fact that the judge permitted the registration of the said unionist voters and also of a republican voter who was present.

In our opinion the charge of closing before time was proved, but it was not shown that the judge directly refused to register republican voters or consequently manifested the partiality with which he was also charged. This being so, it follows that the defendants did not prove all of the charges made by them.

Now, the question is the circumstances attending this case. Was it a cold and malicious charge made with the

intention of impeaching the honesty, integrity, virtue or good reputation of the Municipal Judge of Bayamón, the Chairman of the Registration Board of Cataño? Was the matter one of public interest? What was the position of the defendants in relation to the chairman of the board and to the person to whom the telegram was addressed? Did the defendants act on motives 'that might reasonably explain their attitude? Did they act in bad faith? What was their purpose?

It is evident that the matter was one of public interest. It is of interest to the community that the registration, the basis for the preparation of the poll lists, be conducted strictly in accordance with the law.

It is likewise evident that the defendants participated in the matter not as individuals, but in a representative capacity. One was chairman of the local committee of a political party and the other two were agents of the said committee appointed to inspect the registrations. The said defendants were, therefore, in direct relation with the chairman of the board, and at least one of them appealed first to him and afterwards to another person who was the general counsellor of the party to which they belonged and communicated not only with him, but also, in exactly the same manner, with the Supervisor of Elections, asking him for an investigation which was actually made and the result of which we already know, that is: The judge was not found guilty of the charge made, but it was recommended that the practice of putting up a barrier be prohibited in order to avoid incidents like the one which brought about the investigation.

We believe that there is nothing in the conduct of the judge, the chairman of the board, revealing the commission of a criminal act. Assuredly he acted in good faith, but the fact is that his order to close the booth, or for the performance of an act ostensibly indicating the closing of

the booth, was unlawful and brought about the whole controversy.

The defendants exceeded the proper limits in their charges, but having based their action on an apparently unlawful act of the chairman of the board, the matter being one of public interest and the defendants having acted in a representative capacity, communicating exclusively with a person who held a similar position on a higher plane and with the public official in charge of the supervision of the elections throughout the Island, their communication should be considered as privileged to a certain extent, and it must be held that they did not commit a criminal act.

The judgment must be reversed and the defendants discharged.

*Reversed.*

Justices Aldrey, Hutchison and Franco Soto concurred.

Mr. Justice Wolf took no part in the decision of this case.